UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOSE ADAN MARTINEZ CASTRO<br>a/k/a "CHUCKY" | Criminal No. 15-10338-FDS |

**SENTENCING MEMORANDUM OF THE UNITED STATES
AND MOTION FOR UPWARD DEPARTURE AND/OR VARIANCE**

Jose Adan Martinez Castro, a/k/a "Chucky," was the leader of the East Coast Program of MS-13, arguably the most violent criminal organization operating in the United States right now. In that capacity, he was the leader and supervisor of MS-13 cliques operating in multiple states across the country, including Massachusetts, Ohio, Texas, Virginia, and Maryland. The critical piece of evidence against Castro includes a recording of an MS-13 leadership meeting—led by the defendant at his home in Virginia—where MS-13 clique leaders from across the country gathered to discuss how best to expand and control MS-13's territory, including through murder.

The Racketeer Influenced and Corrupt Organizations Act was designed to target the structure and leadership of organized crime, and in this case—which, to date, has resulted in 49 convictions including 16 defendants being held responsible for murder—no defendant had a more meaningful role in the organizational structure and leadership of MS-13 than Castro. The government seeks a sentence of ***235 months in prison followed by 3 years of supervised release***, the top of the Guideline Sentencing Range as calculated by the government.

1

Imposing the government's requested sentence of 235 months does not require the Court to depart or vary upwards. However, in the event that the Court disagrees with the government's calculation of the Guideline Sentencing Range, the facts and circumstances of this case also support an upward departure and/or variance, either of which would independently support the requested sentence of 235 months. If not for the statutory maximum of 240 months, the sentencing factors outlined in 18 U.S.C. §3553(a) may very well have supported an even higher sentence.

## ARGUMENT

### I. The Defendant's Guideline Range is At Least 188 to 235 Months.

As always, the Court must begin with a calculation of the Guideline Range. In this case, both sides disagree with Probation's calculation of the Guideline Range, which Probation calculated as 151 to 188 months based upon a total offense level of 34. *See* PSR, ¶ 92. Castro raises various objections claiming that his total offense level should be 16 and his Guideline Range should be only 21 to 27 months. *See* PSR at pp. 37-39. Conversely, while the government largely agrees with Probation's calculation, the government believes that the defendant deserves an enhancement for use of a minor, which would result in a total offense level of 36 and a Guideline Range of 188 to 235 months. *See* PSR at pp. 35-36. The government addresses each area of dispute below to support its argument for a Guideline Range of 188 to 235 months. Further, given the nature of the defendant's objections, the government reserves its right to object to the defendant receiving credit for acceptance of responsibility, which may increase the defendant's Guideline Range to 240 months.

### A. The Defendant's Relevant Conduct Involves Conspiracy to Murder and his Base Offense Level Should be 33.

Over the past two and a half years, this Court has presided over the largest single prosecution of MS-13 leaders, members, and associates in the country. In this case, 49 leaders, members, or associates of MS-13 have been convicted following trial or via guilty pleas, with 16 defendants being held responsible for murder and others being held responsible for attempted murder, conspiracy to murder, or accessory after the fact to murder. Over the course of four trials and numerous sentencing hearings, the Court has repeatedly heard evidence about how murder is central to MS-13's operations and mission. Castro was the leader of the East Coast Program of this violent criminal enterprise—a gang whose rules require the murder of gang rivals and those who cooperate with law enforcement.

Even putting aside the other compelling evidence of the charged racketeering conspiracy involving murder and the East Coast Program's involvement in murder, law enforcement recorded Castro chairing an MS-13 leadership at his own home where he and other MS-13 leaders discussed murder in furtherance of the MS-13 conspiracy. *See generally* Exhibit 1 (Transcript of December 13, 2015 leadership meeting, which was admitted into evidence in all four trials in this case, including as Ex. 227 in the recent trial of Edwin Gonzalez).

Notwithstanding the above, "the defendant denies that the government has established by a preponderance of the evidence that the conspiracy was to commit murder and denies that the base offense level should be 19." PSR at p. 38 (Objections

3

4 and 5). Probation's response to this Objection summarizes why this objection is meritless:

> At various times during the meeting on December 13, 2015, the defendant and his co-conspirators discussed murder. These conversations including the group being united because of hits that were going to happen (paragraph 26), the killing of cooperators (paragraphs 27), the killing of a clique leader who did not follow Program rules (paragraph 31), and the killing of a teacher who was disrespecting the gang, along with other "hits" (paragraph 39). Therefore, a preponderance of the evidence supports that the underlying racketeering activity was conspiracy to commit murder (USSG §2A1.5). The defendant was the leader of the East Coast Program that was involved in murders, and was present at the meeting and engaged in murder-related discussions.

PSR at pp. 37-38.

A review of the evidence thus makes clear that the defendant's base offense level should be 33, not 19. *See also United States v. Garcia,* 754 F.3d 460, 484-85 (7th Cir. 2014) (affirming the application of §2A1.5 to a leader of the Latin Kings who similarly pled guilty to RICO conspiracy and was sentenced to 240 months; finding that "the use of murder as a tool to maintain the gang's reputation, protect its territory, and further its drug trade was foreseeable" to the defendant and "it does not matter that there was no evidence that he pulled a trigger."). There can be no question about the reasonable foreseeability of murder in a case where the leader of the entire East Coast Program of MS-13 is caught on tape personally discussing murder with leaders of the cliques belonging to the East Coast Program.

### B. The Defendant Deserves a Leadership Enhancement.

The defendant frivolously minimizes his offense conduct and his role in the conspiracy, first by denying that he acted in a leadership capacity, *see* PSR at pp. 37-

4

38 (Objections 3, 5, and 6), and then by claiming that he should be given a downward departure because of his minimal role or coercion. *See* PSR at p. 39 (Objection 10).

The lengthy recording of the East Coast Program meeting makes clear that Castro was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *See* U.S.S.G. § 3B1.1(a). During the meeting, which was organized at Castro's own home, Castro gave instructions to other leaders of MS-13, Castro asked about how other MS-13 cliques were doing across the country, and the back-and-forth conversations make clear Castro's relative hierarchy and leadership role in MS-13. Further, during the initial part of the meeting, Castro asserts that he was given authorization to make decisions and the purpose of the meeting was to coordinate and organize the various cliques within the East Coast Program of MS-13. *See generally* Exhibit 1.

The question for the Court at sentencing should not be whether the defendant deserves a leadership enhancement—he plainly does. The better question is whether the defendant deserves credit for acceptance of responsibility given his failure to admit and acknowledge his relevant conduct. *See infra* at pp. 9-10.

**C. <u>The Defendant Deserves an Enhancement for Use of Minors</u>.**

Castro should receive a two-level enhancement under U.S.S.G. § 3B1.4 for use or attempted use of a minor to commit a crime, and the government incorporates by reference its Objection to the PSR where it discusses why this enhancement is appropriate. *See* PSR at pp. 35-36.

Castro was the leader of the East Coast Program and was intimately familiar with the inner workings and recruitment efforts of MS-13. As this Court has heard repeatedly, MS-13 almost exclusively recruits minors to become "paros" and "chequeos" to help assist the gang in its criminal activities. These minors often go on to become "homeboys" of MS-13, which requires the commission of a significant act of violence, usually murder. In this case alone, the Court has heard evidence of *dozens* of defendants who were recruited into the gang as minors, including many who went on to commit murder. And that was just in Massachusetts over a discreet period of time—the defendant was the leader of the East Coast Program of MS-13, whose tentacles spread as far wide as Columbus, Ohio and Houston, Texas. Importantly, in the recording of the MS-13 leadership meeting chaired by Castro, the MS-13 leaders discuss the recruitment, mentoring, and supervision of "kids" and younger members. *See e.g.*, PSR at ¶35.

In drafting the PSR, Probation recognized that "MS-13, as whole, encouraged the recruitment of individuals under the age of 18," noted that "high school students were routinely recruited to join the gang," and acknowledged that "it is apparent that the defendant encouraged and supported these recruitment practices as a leader of the program." PSR at p. 36. Nonetheless, Probation declined to apply this enhancement because there was no evidence that the defendant himself recruited anyone under the age of 18 to commit a specific offense. The government respectfully disagrees with that analysis.

Under U.S.S.G. § 3B1.4, a defendant receives an enhancement for the use or attempted use of minors in the commission of a crime. The Introductory Commentary to Part B of Chapter 3 of the Guidelines, of which § 3B1.4 is a part, states:

> The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), *i.e.*, all conduct included under §1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of conviction.

Relatedly, U.S.S.G. § 1B1.3(a)(1)(B) states that in the case of a jointly undertaken criminal activity, Chapter 3 enhancements apply to "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B); *see also* Application Note 3.

Based on U.S.S.G. § 1B1.3(a) and accompanying guidance, courts have applied the use of minor enhancement under § 3B1.4 even where a defendant did not personally employ a minor in the commission of a crime. *See, e.g.*, *United States v. Patrick*, 248 F.3d 11 (1st Cir. 2001); *United States v. Lewis*, 386 F.3d 475, 479-80 (2d Cir. 2004); *United States v. McClain*, 252 F.3d 1279, 1287-88 (11th Cir. 2001).[1]

---

[1] There is a Circuit split on this issue, with some Circuits disagreeing with the First, Second, and Eleventh Circuits that § 3B1.4 can be applied if the use of minors is merely reasonably foreseeable to a defendant, as opposed to a defendant directly employing a minor. *See, e.g.*, *United States v. Acosta*, 474 F.3d 999 (7th Cir. 2007) (collecting cases). The government submits that the cases applying § 3B1.4 based on the reasonably foreseeable actions of co-conspirators are better reasoned; in any event, to the extent the Court has doubts, it must apply the guidance of the First Circuit. *See United States v. Corbett*, 870 F.3d 21, n. 16 (1st Cir. 2017) (affirming application of § 3B1.4 enhancement and acknowledging the circuit split but stating that the First Circuit has already weighed in on this debate).

In *Patrick*, the First Circuit held that the § 3B1.4 enhancement applied to the defendant, even though there was no evidence that the defendant himself employed the use of a minor. 248 F.3d at 27-28. The Court reasoned that "because [the defendant] was convicted of conspiracy, his sentence could be enhanced based on his co-conspirator's reasonably foreseeable use of juveniles to further the [conspiracy's] activities." *Id.* (citing U.S.S.G. § 1B1.3(a)); *see also United States v. Mott*, 26 Fed. App'x 8, 10 (1st Cir. 2001) ("The First Circuit has held that an enhancement under § 3B1.4 may be based on the relevant conduct principle that defendants are responsible for the foreseeable acts of their co-conspirators") (citing *Patrick* and § 1B1.3(a)).

Given how MS-13 continually seeks to bolster and replenish its ranks through the recruitment of minors, the leader of the East Coast Program of MS-13 deserves an enhancement for the gang's use or attempted use of minors. Castro cannot credibly argue that he did not know and could not have foreseen that the cliques he supervised would use minors in furtherance of MS-13's criminal activities. Indeed, the MS-13 leadership meeting discussed as much.

Both legally and as a policy matter, an MS-13 leader like Castro deserves an enhancement for the use of minors given how critical the recruitment of minors is to the operations of MS-13. *See id.*; *see also United States v. McClain*, 252 F.3d 1279, 1287-88 (11th Cir. 2001) (holding it was reasonably foreseeable that co-conspirators would use minors since the conspiracy was "in the practice of recruiting" minors); *United States v. Lewis*, 386 F.3d 475, 479-80 (2d Cir. 2004) (holding it was reasonably foreseeable to an organizer of a drug distribution ring that minors would be used).

### D. The Government Reserves its Right to Oppose Castro Receiving Credit for Acceptance of Responsibility.

Application Note 3 to U.S.S.G. § 3E1.1 states, "A defendant who enters a guilty plea is *not* entitled to an adjustment under this section [for acceptance of responsibility] as a matter of right." U.S.S.G. § 3E1.1, n. 3 (emphasis added). Further, Application Note 1 to U.S.S.G. § 3E1.1 makes clear that "*a defendant who falsely denies, or frivolously contests, relevant conduct* that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1, n. 1 (emphasis added). "To prove acceptance of responsibility, a defendant must truthfully admit or not falsely deny the conduct comprising the conviction, *as well as any additional relevant conduct for which he is accountable.*" *Garrasteguy*, 559 F.3d 34, 38 (1st Cir. 2009) (emphasis added).

The "defendant has the burden of proving his entitlement to an acceptance-of-responsibility credit." *United States v. Franky-Ortiz*, 230 F.3d 405 (1st Cir. 2000) (citation omitted). "The defendant must demonstrate candor and authentic remorse as opposed to mouthing a pat recital of the vocabulary of contrition." *United States v. D'Angelo*, 802 F.3d 205, 210 (1st Cir. 2015) (citation and quotation omitted). "Where a defendant resorts to evasions, distortions, or half-truths in an effort to minimize his culpability, whether during a presentence interview or in his allocution, the district court may appropriately decide to withhold an acceptance-of-responsibility credit under section 3E1.1." *United States v. Ocasio-Rivera,* 991 F.2d 1, 5 (1st Cir. 1993).

Here, the defendant has gone out of his way to deny relevant conduct for which he is responsible, and in particular, has denied the basic facts about his role and involvement in the conspiracy, and his leadership role in MS-13. The government reserves its right to argue that the defendant is not entitled to credit for acceptance of responsibility depending on the positions taken by the defendant at sentencing.

### E.  The Appropriate Calculated Guideline Calculations.

Assuming the defendant can meet his burden of proving that he is entitled to credit for acceptance of responsibility, the defendant's guideline range should be calculated as follows:

```
Base Offense Level under §§ 2A1.5(a) and 2E1.1(a)(1)          33
Adjustment for attempted use of minor under § 3B1.4           +2
Adjustment for role in the offense under § 3B1.1(a)           +4
                                                         =========
Adjusted Offense Level                                        39
Acceptance of Responsibility                                  -3
                                                         =========
Total offense level                                           36
Guideline Sentencing Range                           188 to 235 months
```

If the defendant does not receive credit for acceptance of responsibility, his total offense level will result in an increase of the Guideline Sentencing Range to the statutory maximum of 240 months.

### F.  Motion for Upward Departure, if Required.

In the event the Court disagrees with the government's calculation of the Guideline Range, a number of sentencing policy statements would nonetheless support an upward departure to achieve the government's sentencing

recommendation of 235 months. The government highlights two policy statements in particular:

**U.S.S.G. § 5K2.0(a)(2): Departures Based on Circumstances of a Kind Not Adequately Taken Into Consideration (Policy Statement).**

This case presents numerous aggravating circumstances that the Sentencing Guidelines do not adequately take into consideration. Among other things, the defendant was a leader of a transnational criminal organization who was supervising violent cliques in multiple states across the country. These cliques were filled with gang members who were recruited to commit, motivated to commit, and did indeed commit murder. Most of the members in the gang were recruited as minors and most were recruited from vulnerable communities, whether it be local high schools or low-income and immigrant communities afraid of seeking help from law enforcement. The defendant was the leader of the entire East Coast Program, and in that capacity, he not only organized and supervised multiple cliques, but he also coordinated with El Salvador in the management of the MS-13 criminal organization. The Guidelines simply do not adequately capture the dangers associated with a transnational criminal organization setting up base across the United States and recruiting minors to commit murder, and a defendant helping to coordinate and supervise the expansion of the gang across numerous states at the direction of foreign leaders.

**U.S.S.G. § 5K2.14.  Public Welfare (Policy Statement).**

The Guidelines also allow for an upward departure "[i]f national security, public health, or safety was significantly endangered." U.S.S.G. § 5K2.14. It is hard to imagine a conspiracy that more greatly endangers public welfare than a

11

transnational criminal organization with members across the United States conspiring to commit murder.

The Sentencing Guidelines do not adequately capture how the public welfare is threatened by violent street gangs. *See, e.g.*, *United States v. McNeal*, No. 90-50532, 1991 WL 268723, at *1 (9th Cir. 1991) (holding that "because gang activity is an aggravating circumstance not considered by the [Sentencing] Commission, and because departure based on U.S.S.G. § 5K2.14 is permissible, the [sentencing] court had the legal authority to depart."); *United States v. Romero*, 239 Fed. Appx. 547 (11th Cir. 2007) (in a racketeering case, affirming the sentencing court's upward departure from a high-end guidelines sentence of 327 months to an imposed sentence of 400 months based on U.S.S.G. § 5K2.14 because of the dangers that the defendant's crimes created for the public).

## II. Regardless of the Guideline Range, the Court Should Sentence Castro to 235 Months in Custody Plus 4 Years of Supervised Release.

Each of the sentencing factors in 18 U.S.C. § 3553(a) strongly support the government's request for a sentence of 235 months (which, under the government's calculation, is a Guideline sentence, but would be an appropriate sentence in any event). Castro, as the leader of the East Coast Program, was providing guidance to MS-13 clique leaders from across the country, who were then going back to their respective cliques to relay those orders and the rules of the gang to the local rank-and-file members. Castro is one of the highest-ranking MS-13 leaders ever prosecuted in this country, and based on his supervisory and leadership role, the highest-ranking MS-13 member indicted in this case.

### A. The Nature and Circumstances of the Offense

The nature and circumstances of the offense could not be more troubling. "In 2012, MS-13 became the first, and remains the only, street gang to be designated by the United States government as a 'transnational criminal organization.'" PSR, ¶ 11. "Today, MS-13 is one of the largest criminal organizations in the United States, with over 6,000 members in the United States, and with a presence in at least 46 states and the District of Columbia." *Id*.

"MS-13 in Massachusetts, as in other states, is run by the incarcerated leadership of MS-13 in El Salvador, known as La Ranfla." PSR, ¶ 12. The leaders in El Salvador "communicate directives and orders to members of MS-13 in the United States, including directives to be more active in killing rival 18th Street gang members, 'green light' orders to kill suspected informants or those disloyal to MS-13, and directives to send more money to the leadership in El Salvador." *Id*.

"MS-13 is organized in Massachusetts and elsewhere in the form of "cliques"—that is, smaller groups, with a leadership structure, acting under the larger mantle of MS-13 and operating in a specific region, city, or part of a city." PSR, ¶ 13. "To coordinate hundreds of cliques made up of thousands of MS-13 members located in numerous disparate locations, La Ranfla separates the criminal organization into 'programs.'" *Id*. "Grouping the various cliques into these programs creates a hierarchy that expedites the process of getting orders from leadership in El Salvador to the street and remitting money from the street back to leadership." *Id*.

"Most of the cliques in Massachusetts fall under the East Coast Program, which also has cliques in Maryland, Virginia, New York, New Jersey, North Carolina, Texas, and Ohio." PSR, ¶ 16.

As the leader of the East Coast Program, Castro—more than any other person indicted in this case—was responsible for furthering MS-13's organizational structure and furthering the information flow between leaders in El Salvador and local leaders in Massachusetts and other states. "Castro lived in Virginia and supervised the activities of the East Coast Program from Virginia." PSR, ¶ 22.

On December 13, 2015, using a cooperating witness, the government recorded a meeting of the East Coast Program leadership. PSR, ¶ 23. This meeting took place at the home of Castro in Richmond, Virginia. *Id.* In attendance at the meeting were leaders of East Coast Program cliques from Massachusetts, Ohio, Texas, and Virginia. *Id.* The meeting was chaired by Castro, who was joined over the phone by Edwin Mancia Flores aka "Sugar," the El Salvador-based leader of the East Coast Program. *Id.*[2]

"The recorded meeting provided evidence about the organizational structure, leadership structure, and recruitment system, and the means, methods, goals, objectives, and operating principles of MS-13." PSR, ¶ 24. The meeting provided a

---

[2] The government's investigation revealed that an MS-13 program has both a United States-based leader who oversees and supervises the program from the streets in the United States, as well as an El Salvador-based leader who provides guidance and leadership from El Salvador (often from a prison in El Salvador). In this case, Castro aka Chucky was the United States-based leader of the East Coast Program, and Flores aka Sugar was the El Salvador-based leader of the East Coast Program.

14

critical and previously unseen look into the inner workings of MS-13's leadership structure and information flow. During the meeting, Castro and the other MS-13 leaders were recorded discussing various territorial issues, with Castro making clear to the participating clique leaders that there was enough space in the East Coast Program for all of the cliques to operate cooperatively. PSR, ¶ 25. Later in the meeting, Castro mentioned how he had discussed some of these issues with leaders in El Salvador. *Id.* Castro made multiple comments about the need for the cliques in the East Coast Program to unite and work together. *Id.*

Importantly, as part of the discussion, Castro mentioned the need for the cliques to be better at planning and coordinating hits (i.e., murders) in furtherance of MS-13's mission, and he confirmed that murders generally had to be approved by MS-13 leaders before the local members could carry them out, instead of local cliques informing him about murders after the fact:

> CASTRO: [UI] in our program—in our program, all the cliques have to be united. They have to be united, especially because of all the hits that are going to happen; these have to be coordinated and requested beforehand and they have to be evaluated to see whether they'll actually happen or not, homeboy, because look, there are cliques that are doing things here, man, and I hear about it a week later, after they did it and what's up with that? They end up looking bad and they make us look bad too, bro.

Exhibit 1, p. 2.

Castro then went on to provide guidance regarding killing those who were "snitching," *i.e.*, cooperating with law enforcement. Disturbingly, Castro told clique leaders (including leaders from Massachusetts who were present) that the East Coast Program allows the killing of even the family members of cooperators:

15

> CASTRO: This is why I'm telling you they need to plan it well and all the sons-of-bitches that are snitching, you know that the sons-of-bitches who are doing stuff . . . We are going to investigate them, man, and we are going to kill those sons-of-bitches so they can see what's up. Then, we'll even go after their family, what the program says, homie.

Exhibit 1, p. 3. When combined with the discussion about extending the gang's control, carrying out hits, selling drugs, and avoiding detection by law enforcement, these statements make clear that the defendant's offense conduct warrants as significant a punishment as possible. If not for the statutory maximum of 240 months and the defendant's early plea, the government would likely have sought an even higher sentence than the 235 months it is seeking now.

### B. The History of the Defendant Does Not Mitigate His Conduct.

The defendant "was raised by both parents with whom he enjoyed very good relationships. He did not experience any form of abuse and did not witness any substance abuse within the home." PSR, ¶ 63. "The defendant's family members are aware of the instant prosecution and … they do not understand how he came to be involved in the instant prosecution as he was not raised to engage in such behavior." PSR, ¶72. The defendant appears to have had a more loving and nurturing family environment than most defendants in this case.

The defendant appears to have grown up in extreme poverty and the government does not minimize the difficulty in growing up in that environment. However, countless people grow up in extreme poverty without resorting to a life of violent crime. Moreover, the defendant entered the United States illegally from El Salvador; after he did so, instead of living a lawful life and availing himself of the

16

opportunity of living in the United States, he became one of the senior-most leaders of arguably the most violent gang operating in the United States.[3]

### C. The Need for Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.

Each of these factors also strongly supports the government's recommended sentence of 235 months.  The defendant was taking orders from El Salvador and helping organize and coordinate a violent criminal enterprise across multiple states—a criminal enterprise whose most defining characteristics are the recruitment of minors, the advancement of members through acts of violence, and the murder of rivals and cooperators.  Most of the members in the gang, like the defendant himself, entered the United States illegally.  The tentacles of the criminal enterprise supervised by the defendant reached places as far away as Ohio and Texas.[4]  The seriousness of the offense cannot be overstated and justice demands a punishment that reflects the harm caused by the gang and its leaders.

---

[3]    Notably, MS-13 requires violence (and usually murder) to progress up the ranks, and the defendant likely committed uncharged acts of violence on the way to becoming the leader of the East Coast Program of MS-13.  The defendant's criminal history category almost assuredly underrepresents the defendant's actual criminal history and dangerousness.

[4]    The defendant has already benefited greatly from a sentencing perspective: he is being held responsible for only one conspiracy to murder, even though he was the hub of a vast criminal enterprise conspiring to commit murder in multiple states, and a criminal enterprise seeking to commit murder of different categories of people. Further, he is not being held responsible for any individual murders and he is functionally getting a pass for how his activities affected Ohio, Texas, etc., not to mention the murders in other states that were reasonably foreseeable to him.  Lastly, he is subject to a 20-year mandatory minimum, even though his violation is based on racketeering activity involving murder.

D. **The Need to Afford Adequate Deterrence.**

Perhaps more so than in the case of any other defendant, general deterrence is a compelling reason to sentence Castro to the high end of the Guideline Range, if not higher. Notwithstanding the success of the instant prosecution and the elimination of almost the entire leadership structure of MS-13 in Massachusetts at the time of the 2016 takedown, the government is under no illusion that MS-13 has ended its efforts to gain control of territory in Massachusetts and other states. The strongest possible message must be sent to MS-13 leadership, both in the United States and in El Salvador, that MS-13 leaders who help coordinate and organize the gang will be punished to the full extent of the law.

Castro, from his home in Virginia, was in a position to order murders and supervise the activities of MS-13 cliques in Massachusetts and across the United States. The next generation of MS-13 leaders must be adequately deterred from continuing such activity and they must be sent an unequivocal message that even if they never step foot in Massachusetts, they will receive stiff sentences if they help organize the gang's activities in Massachusetts and try to increase violence in our communities.

E. **The Need to Avoid Unwarranted Sentencing Disparities.**

As with the other sentencing factors, this factor also supports a sentence at or near the 20-year statutory maximum. Given the significant sentences given to numerous defendants in this case who were convicted of racketeering conspiracy, the highest leader of the MS-13 racketeering enterprise indicted in this case deserves a

18

sentence commensurate with his role in the conspiracy. The co-conspirators who pulled a trigger or wielded a machete in furtherance of MS-13's mission are undoubtedly deserving of lengthy prison terms, but so is the defendant who supervised the activity of multiple cliques in multiple states comprising hundreds of MS-13 members who were willing to pull a trigger or wield a machete in furtherance of MS-13's mission. In a case where numerous lower-level defendants will receive sentences greater than 20 years, the defendant deserves a sentence at or near the 20-year statutory maximum.

## Conclusion

For the reasons above, the Court should sentence the defendant to ***235 months in custody followed by 3 years of supervised release***. If the Court's calculation of the defendant's Guideline Range is lower than the government's calculation, the government requests that the Court depart or vary upward to impose a sentence that complies with the sentencing purposes set forth in 18 U.S.C. § 3553(a).

    Respectfully submitted,

    ANDREW E. LELLING
    United States Attorney

By:   /s/ Kunal Pasricha
    Kunal Pasricha
    Glenn A. MacKinlay
    Christopher Pohl
    Kelly B. Lawrence
    Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I, the undersigned, certify that the foregoing document was filed through the Electronic Court Filing (ECF) system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

/s/ Kunal Pasricha
KUNAL PASRICHA
Assistant United States Attorney